**Karen SIDDLE, Plaintiff,**

v.

**The CITY OF CAMBRIDGE, OHIO, et al., Defendants.**

**No. C2–85–1727.**

United States District Court,
S.D. Ohio.

April 2, 1991.

James McNamara, Columbus, Ohio, for plaintiff.

Daniel George Wiles and John M. Kelley, Columbus, Ohio, for City of Cambridge, Cambridge Police Dept., Gerald L. Jones and Frank Stroud.

Robert Louis Berry, Columbus, Ohio, for James Carpenter.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This case comes before the Court pursuant to Defendants'[1] motion for summary

---

[1]. The Defendants represented by this motion are: the City of Cambridge, Ohio, the Cambridge Police Department, Gerald Jones, Frank Stroud, Robert Hill, Paul Armbruster, Glenn Wills, Kenneth Grubbs, Jeffrey Aker, Jan Ickes, William Myers, Steven McPeek, Richard Wayt and Gary Lucas. The individuals named are members of the Cambridge Police Department, with the exception of Gerald Jones, who is the Director of Law for the City of Cambridge. Defendants James Carpenter, Michael Warner and John Davis of the Guernsey County, Ohio Sheriff's Department have been released with prejudice by Plaintiff.

judgment pursuant to Rule 12(b)(6) of the Rules of Civil Procedure. Defendants seek summary judgment on the following grounds: [2]

1) that the defendants violated no right, substantive or procedural, granted to Plaintiff under the Due Process Clause of the Fourteenth Amendment.

2) that as a matter of law and fact the Defendants herein did not deny Equal Protection of the Law to Plaintiff as required by the Fourteenth Amendment.

## FACTS

The nature of this case is such that a lengthy and detailed fact pattern is necessary for just adjudication of the claims. On June 9, 1985, Plaintiff Karen Siddle (now known as Karen Wagstaff) abandoned her then abusive husband, James Siddle, and her children. She moved into an apartment with a friend, Christina Hess. Mr. Siddle did not learn that his wife had left until she failed to returned home from work on that day.

On June 11, 1985, Mr. Siddle went to Plaintiff's apartment, ostensibly to speak with her. However, after Plaintiff refused to open the door, he broke a window to gain entry and abducted her. The abduction was reported to the Guernsey County Sheriff's Department. Plaintiff claims that the Defendant Cambridge City Police Department was notified within one week of the abduction. Also, Defendant Gerald Jones, the City of Cambridge Solicitor, was notified on or about the time of the July 11, 1985, incident which will be fully explained later. Following this first abduction, both Plaintiff and Ms. Hess moved into Haven of Hope, a shelter for battered women.

On June 13, 1985, someone at Haven of Hope reported a suspicious male parked across the street from the shelter. Officer Robert Hill responded and was admitted to the shelter by Bev Mathers, an employee of the shelter. As he was instructed by the caller, he entered through a side door. Ms. Mathers told him that the husband of one of the shelter's clients was parked in the parking lot adjacent to a hardware store across the street from Haven of Hope. At that time, she only requested that the officer ask the man to leave the area. Officer Hill left the shelter, drove his cruiser to the parking lot where the man was parked and confronted him. Officer Hill asked for identification and checked the registration of the car. Finding no outstanding warrants, he told the man, who was identified as Mr. Siddle, to leave the area and not to return. However, Plaintiff and Ms. Hess claim that Mr. Siddle was frequently in the area and that they reported this activity to the police. The police would respond by sending a cruiser through the neighborhood. (Affidavit of Karen Siddle/Wagstaff, paragraph 9) (Affidavit of Christina Hess, paragraph 9).

On July 8, 1985, Mr. Siddle drove up and began speaking to Plaintiff while she was in the parking lot of the Cambridge Post Office. The two agreed to meet in a city park. At the park, they spoke for few minutes, then Mr. Siddle grabbed Plaintiff and forced her into his car. He drove away with her for several hours of high speed driving. Ms. Hess ran to a nearby house and phoned Haven of Hope who, in turn, called the Guernsey County Sheriff's Department. Ms. Hess never personally spoke with the Police department in connection with this incident.

Plaintiff filed an affidavit with the Court of Common Pleas of Guernsey County on July 9, 1985, and the Court granted an *ex parte* preliminary order. The order prohibited Mr. Siddle from "abusing, beating, molesting or assaulting the petitioner, Karen Siddle." Mr. Siddle did not know of the order until July 11, 1985. The order was finalized on July 22, 1985.

On July 11, 1985, Ms. Hess was driving her car in Cambridge with Plaintiff as a passenger. Mr. Siddle, accompanied by the Siddles' children, found them and began to follow them. After a chase which included running a stoplight and driving the wrong

---

**2.** Plaintiff has voluntarily withdrawn her state tort claims pursuant to Rule 41 of the Rules of

Civil Procedure.

way on a one-way street, Ms. Hess pulled into the Cambridge Police Department parking lot and flagged down Officer Hill. Plaintiff informed the officer that Mr. Siddle was harassing them and her husband shortly thereafter pulled into the parking lot. At that point, Officer Hill decided that he may be faced with more trouble than he could handle alone and called inside the police station for additional officers to help him keep the situation under control. Captain Jim Lackey and Patrolman Larry Able responded to this request.

Between the time that he requested the help and the other officers' arrival on the scene, Officer Hill began questioning Mr. Siddle as to his intentions and why he followed the Plaintiff. Mr. Siddle responded that he wanted to talk to his wife and his children wanted to see their mother. When Captain Lackey arrived Plaintiff brought the Protective Order to his attention and he read it. After reading the Protective Order, the police ushered both Plaintiff and Mr. Siddle into the station where both were further questioned. Subsequently, Mr. Siddle was arrested, booked and incarcerated. Additionally, Mr. Siddle underwent psychiatric evaluation by Dr. Jesus from the State Mental Hospital. This evaluation determined that Mr. Siddle was not mentally unstable. The children were committed to the County's Children's services.

While Mr. Siddle was incarcerated, Plaintiff and Defendant Gerald Jones, the solicitor for the City of Cambridge, discussed the prosecution of Mr. Siddle. Mr. Jones, based on the information he received from the police department and from the interview with Plaintiff, decided not to press charges under the Ohio Domestic Violence Statute, Ohio Revised Code 2919.25, because he believed that the statute had not been violated.

On August 24, 1985, Ms. Hess and Plaintiff went to a Bargain City store to go shopping. At approximately closing time, Mr. Siddle again abducted Plaintiff from the parking lot. He threatened Plaintiff and Ms. Hess with physical harm if either one called the police. He forced Plaintiff into his car and drove around for a period of hours with their children in the back seat. Later, Plaintiff was returned to her apartment unharmed. Neither Ms. Hess nor Plaintiff reported the incident, possibly because of the threats.

On September 3, 1985, at about 4:00 p.m. Cambridge City Police received a report that Plaintiff was being abducted from a Super Duper Store by Mr. Siddle. The police responded by sending Patrolman Ickes and Lieutenant Armbruster in separate cruisers. By the time the police arrived on the scene the disturbance was finished. They cruised through the parking lot looking for a maroon Chevrolet Impala. When they did not find the vehicle they decide to travel in opposite directions; Patrolman Ickes went east and Lieutenant Armbruster went west. At about 7:30 p.m. Ms. Hess called the police to tell them that she believed that there was a chance that Mr. Siddle was taking Plaintiff to Florida. After a phone call from Captain Lackey, who was notified at home by Plaintiff's step-mother of this possibility, the police department issued a teletype to all law enforcement departments between Cambridge and Florida to apprehend people who fit the description of Mr. Siddle and Plaintiff. The Police included a description of the maroon Chevrolet Impala. The teletype was issued at about 8:00 p.m. At approximately 1:00 a.m. on September 4, 1985, Plaintiff returned to her apartment and the police department received a call that Plaintiff wanted to speak with an officer.

Lieutenant Defurney and Officer McPeek went to Plaintiff's apartment. While there they discussed primarily two issues: whether Mr. Siddle would go to jail and who would get custody of her children. Ultimately, Plaintiff decided not to press charges at that time because she wanted to speak with her attorney first.

The following day Plaintiff went to see Gerald Jones or his assistant Frank McClure. Neither was in his office when she arrived. She left and never again contacted them about the incident.

On September 10, 1985, Plaintiff visited her aunt in Cambridge. Mr. Siddle drove by the house, slowed down, returned, but never stopped. Plaintiff called the police who responded by cruising the area and then left. On that day Plaintiff and Mr. Siddle had no contact with each other.

On October 1, 1985 Plaintiff and Ms. Hess were eating in a Smorgasbord Restaurant when they noticed Mr. Siddle parked in the restaurant's parking lot. Plaintiff ran into the Ladies' restroom and hid there, while Ms. Hess phoned the police. The police arrived approximately 12 minutes after the call, searched the area, found no one matching Siddle's description and left. However, Plaintiff and Ms. Hess felt forced to run from the restaurant to their car to escape Mr. Siddle. Once again, there was no contact between Plaintiff and Mr. Siddle.

## STANDARD OF REVIEW

In considering this motion, the Court is mindful that the standard for summary judgment "mirrors the standard for a directed verdict under [Rule 50(a)], which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) citing *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479–480, 64 S.Ct. 232, 234–235, 88 L.Ed. 239 (1943). Thus, the Supreme Court concluded in *Anderson* that a judge considering a motion for summary judgment must "ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." 477 U.S. at 252, 106 S.Ct. at 2512.

■ Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In essence, the inquiry is whether the evidence presented a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

■ Such an inquiry necessarily implicates the evidentiary standard of proof that would apply at the trial on the merits. As a result, the Court must view the evidence presented through the prism of the substantive evidentiary burden. Rule 56(e) therefore requires that the nonmoving party go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

In *Banks v. Rockwell International N. Am. Aircraft Operations*, 666 F.Supp. 1053 (S.D. Ohio 1987) (J. Graham), this district enunciated the importance of granting summary judgments in appropriate situations by stating that: "Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed to secure the just, speedy and inexpensive determination of every action." *citing, Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553, (quoting Fed.R.Civ.P. 1); *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

■ Thus, the mere existence of a scintilla of evidence in support of a plaintiff's claim is insufficient—there must be evidence upon which a jury could reasonably find for the plaintiff. Having discussed the Rule 56 standard of review, the Court now turns to the merits.

## LAW AND ANALYSIS

The Plaintiff in this case appears before the Court with substantive and procedural due process claims as well as an equal protection claim. It is undisputed that after Plaintiff left her husband on June 11, 1985, he, over a period of months, harassed her. Plaintiff claims that under at least one of her theories she is entitled to relief.

### I. Due Process Claims

Plaintiff initially argued that as a substantive right under the Fourteenth Amendment's Due Process Clause, she is entitled to government protection from violence. She argues without such protection she is denied her liberty without due process of law. The Supreme Court recently addressed this issue in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

*DeShaney* involved a four-year-old minor, Joshua DeShaney, whose father so brutally beat him that he suffered massive brain damage and was rendered profoundly retarded. The minor and his mother brought a 42 U.S.C. § 1983 action against the County Social Services and several individuals who failed to remove the child from his father's home alleging a deprivation of Constitutional rights without due process of law. Although the County maintained custody of the child for a brief period while they investigated the father for child abuse and took various steps to remedy the situation, they left the child primarily in the custody of his father.

The Court noted the tragedy inherent in the case but held that there is no substantive due process clause right to protection from violence perpetrated by private actors. They reasoned that historically and as that Clause is worded, it acts as limitation on state powers, not as a limitation on individual action. The Court held "[a]s a general matter, then, we conclude that a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. This rule is true even if the government agents knew of a potential danger and fail to prevent it. "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them ... Under these circumstances, the State had no constitutional duty to protect Joshua." *Id.* at 201, 109 S.Ct. at 1006. Thus, the state had no duty to protect Plaintiff under the Due Process Clause.

■ The lone exception to this rule does not apply to Plaintiff. By harmonizing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and *Youngberg v. Romeo* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court limited the "special relationship" doctrine and thereby the duty, to cases where the state has custody of the individual. "The affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1006. Naturally, the state had not so limited Plaintiff's freedom in this case, thus, a duty does not arise under that exception.

■ This analysis alone does not dispose of the issue because the *DeShaney* Court specifically limited its opinion to the area of substantive due process claims involving actions by private citizens. *See DeShaney* 489 U.S. at 195, n. 2, 109 S.Ct. at 1003, n. 2. Consequently, Plaintiff also asserts that her procedural due process rights have been violated. Yet before a proper procedural due process claim can be maintained, some other property or liberty interest must be at bar. In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Court held that a property interest created by state law was protected by the Due Process Clause. However, for a state property right to exist, a person "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. Therefore, Ohio State law may create such a

property interest if this requirement is met by entitling holders of protective orders to greater rights than other citizens. If such is found, procedural due process may be considered.

■ Naturally, the first place to look for such a right is in the Ohio Revised Code (O.R.C.). Under O.R.C. § 3113.31, a person may seek a protective order to prevent a relative or household member from abusing other family members. Plaintiff sought and obtained such a protective order in this case. This Court believes that such an order creates a property right which incurs a duty on the part of the government. It is immaterial that the right is created by a judicial function at the statutory behest of the Ohio General Assembly. Cf. *Coffman v. Wilson Police Department*, 739 F.Supp. 257 (E.D.Pa. 1990). A protective order such as the one in this case, designed to prevent Plaintiff's husband from "abusing, beating, molesting, assaulting or threatening" Plaintiff, would have no valid purpose unless a means to enforce it exists. Even with the protective order, a person has no right to self-help; therefore, the government has a duty to protect the beneficiary of such an order. Once such a property right is determined to exist, the government's failure to adequately perform this duty may constitute a denial of a right to procedural due process.

■ Under Ohio law, the governments agent's duty is a duty to the public and "a failure to perform it, or an inadequate or erroneous performance, is generally a public and not an individual injury." 37 Ohio St.3d 222, Syllabus Paragraph 2, (1988). Even under Ohio law, absent some exception, Plaintiff is not entitled to protection as an individual. Moreover, at all times, it is important to remember the primary duty of the government is to protect the public. This duty is of paramount importance and is the springboard from which the scope of the duty the government owes to the bearer of the protective order should be determined.

It would be utterly unreasonable to require the police to commit all of its time and resources to the protection of a single individual whether the person possessed a valid court order or not. Equally as obvious, a police department, who owed an individual a duty to protect, could not completely shirk that duty. A police department must be reasonable in its efforts to protect the individual's safety. Likewise, the individual can expect only reasonable protection from the police given their time, resources and personnel. A Solicitor need commit no more time and resources to a case than would be reasonable under the circumstances. Beyond that level of protection, an individual must take legal steps to protect himself or herself, just as the rest of the public is obligated to do.

■ Additionally, Plaintiff submits a another argument under the Due Process Clause that is independent of *DeShaney*. Plaintiff claims that the government and its agents acted under a policy that deprived Plaintiff of her Due Process rights. In *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3rd Cir.1989), the Court noted that "[n]othing in *DeShaney* suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates." *Id.* at 725. Thus, a government may be liable for a policy that deprives a person of his or her constitutional rights. The primary distinction between this theory and the *DeShaney* theory is that in the *DeShaney* situation a private actor caused the injuries, but in this latter theory, the plaintiff claims that the actions of the government's agents directly caused the injury. However, the government will only be liable for those actions that result from *recklessly* maintained policies or customs. *See Stoneking* at 725.

■ In summary, there is no duty to an individual under the substantive prong of the Due Process Clause without some form of restrictive custody. However, a protected property interest can be created by state law. In this case, the protective order is such an interest. Once such a substantive right attaches, the procedural arm of the Due Process Clause requires that the government refrain from depriving the in-

dividual of the right without due process. In other words, when a protective order exists, as in this case, there is a governmental duty to protect the individual, the scope of which is a reasonable protection given the sources ·of the governmental agency responsible. Failure to do so would constitute denial of a protected right without due process of the law. Additionally, if the government's agents maintain a policy that recklessly disregards a person's rights to life, liberty, or property, then it will be liable directly for that policy.

The Court now turns to the question of whether the police department acted reasonably toward Plaintiff. A similar analysis applies to the prosecutorial arm of the government. The City Solicitor's duty is to act reasonably and rationally in their decision making process regarding the bearer of a protective order.

Plaintiff complains of a number of incidents where the Police protection was inadequate. However, Plaintiff's own omissions were often her downfall. On three occasions, the June 11, July 8 and August 24, incidents the police department was not notified of the Plaintiff's predicament. Twice someone called the Guernsey County Sheriff's Department, not the defendants herein, and the August 24 incident the Plaintiff did not report it to any agency. In fact, Plaintiff once met Mr. Siddle in the City Park, placing herself in danger.

Moreover, in other cases the police did react in a reasonable manner. On the June 13 incident, the officer was asked by Bev Mathers only to force Mr. Siddle to leave the area. Officer Hill did this after checking for outstanding warrants and identification. On one occasion, the July 11 incident, Mr. Siddle was arrested, booked, detained and psychiatrically evaluated. The Court is unsure what more Plaintiff expects in this instance. Also, when she met with the City Solicitor, he, in his discretion, failed to press charges because he did not believe the domestic violence statute had been violated for that incident, nor had any crimes been committed within his jurisdiction to prosecute. Plaintiff did not request him to press charges for any earlier incidents. The Court is unwilling to utilize hindsight to declare judgment on the wisdom of the Solicitor's decisions beyond declaring that under the circumstances he acted reasonably.

When Mr. Siddle abducted Plaintiff from the Super Duper store on September 3, they responded appropriately. Upon arrival on the scene they searched the parking lot for Plaintiff or Mr. Siddle. When their search was unsuccessful they devised a plan to search the area as best they could. Moreover, the officers continued to search for Plaintiff and Mr. Siddle during their patrols. Later, Ms. Hess offered some information that Mr. Siddle may be taking Plaintiff to Florida. While the department did not act immediately, their reaction time of about 30 minutes was clearly not unreasonable. The reaction was to issue a teletype. If the information was true, the three hour lapse between the initial call and receiving the subsequent information would probably allow Mr. Siddle the time to get out of the state and certainly out of the Cambridge Police Department's jurisdiction. Therefore, any more reaction would have been outside the Police Department's power.

After Plaintiff's return, she called the Police and requested an officer to come to her apartment. The police sent two officers to take her statement. There is some discrepancy in exactly what was said at that time, even within Plaintiff's testimony, but she alleges that the officers were rude and intimidating. Whether this is true or not, she did not want to press charges at that time because she wanted to speak with her attorney. Even if the officers attitude was exactly as Plaintiff claims and it prevented her from pressing charges against her husband at that time, she did decide to do so the next day after meeting with her attorney. When the City Solicitors were not in their offices, she abandoned her intention to press charges at that point. The City and its agents cannot be blamed for Plaintiff's lack of diligence.

During the September 10 and October 1 incidents, Plaintiff again called the police because her husband was in the immediate

area. Both times the police responded by cruising the area. The reaction was reasonable in light of the facts of the situation. In both there was no contact between Plaintiff and Mr. Siddle. Also, he was doing nothing illegal, not even violating the protective order.

Therefore, the Court finds that the Police Department fulfilled its duty to the individual in this case.

Also, nothing in the Police Department's or the Solicitor's actions reflect a policy to disregard Plaintiff's rights. In fact, they took reasonable steps to protect her. At the risk of redundancy, it is important to note, her actions significantly contributed to any peril she may have encountered. For instance, as mentioned above, three of the occasions did not involve the Cambridge Police Department, because plaintiff failed to notify them. She failed to press charges because the Solicitors were not in their offices. It would be ridiculous to penalize the Police Department for Plaintiff's failure to act. Such circumstances cannot be deemed a policy on the part of the government, and certainly not a policy enacted with reckless disregard for anyone's rights. On the remaining occasions they reacted appropriately and rationally as discussed above.

 Nothing in the facts as presented by Plaintiff show any indication of a policy to deprive Plaintiff of her Constitutional rights. To the contrary, the police took reasonable measures to protect her and her rights. Naturally, by deciding that the government acted reasonably, the court is precluded from finding that the police recklessly disregarded Plaintiff's rights. Thus, the Court holds that there was no reckless disregard for the rights of Plaintiff, and no liability for the government as a result of this theory.[3] Therefore, Plaintiff's Due Process Claims are DENIED.

## II. Equal Protection Claim

 When state services are provided, the government must provide them equally to everyone. Plaintiff argues that she was denied equal protection of the law because services were unequally provided. She alleges that the Defendants, individually and collectively, discriminated against her because of her sex and marital status. If the government treated her case differently because of her marital status, the state must justify the difference by showing that it is rationally related to a legitimate state interest. This standard is used when there is no fundamental right in question and no suspect classification. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 53, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh'g denied* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). A statute that discriminates on the basis of gender will be invalidated unless it is substantially related to an important governmental interest. *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456–57, 50 L.Ed.2d 397 (1976) *reh'g denied* 429 U.S. 1124 (1977). Plaintiff's allegation of gender discrimination stems from the predominance of women as victims of domestic violence.

 Plaintiff points to several areas to show that the government treated her allegations differently. First, she argues that the fact that Mr. Siddle was not arrested is evidence of a difference. Nowhere does Plaintiff show any comparison to other crimes to show a discrepancy in arrest rates nor does she show that the Police failed to arrest her husband as a matter of policy discriminating against her. Second, Plaintiff claims discrimination in that victims of domestic violence are required to fill out offense forms themselves, as opposed to an officer completing them. This written statement is required for warrant-

---

**3.** Alternatively, with these facts and circumstances, Defendants could have relied on qualified immunity to protect them in their individual capacity. "[G]overnment officials performing discretionary functions, generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory rights of which a reasonable person would have known." *Harlow v. Fitzger-*

*ald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Since the above analysis illustrates that Defendants acted reasonably and did not violate Plaintiff's Constitutional rights, Defendants are protected by qualified immunity. Plaintiff alleges no statutory violation resulting from the Defendant's actions or inaction which denies them the benefit of the qualified immunity defense.

less arrest under O.R.C. 2935.03(B), thus the state is justified in requiring the completion to insure factual integrity. Also, the government believed that this was a requirement of the statute. Whether or not such an interpretation is correct, the Court is unwilling to rethink the City's position for them, especially for such a *de minimus* intrusion with little effect on the propensity of a victim to file a charge.

Also, Plaintiff relies on a statement by Captain Lackey which she alleges is an admission that he acted differently because victim and suspect were married. Assuming *arguendo*, that this is such an admission, this factor can only be deemed as evidence of discrimination based on marital status, needing only the less strict "rational basis" test. However, to term the statement an admission is to seriously misinterpret it. Captain Lackey said that the situation confused him, but ultimately he issued the teletype, just as he would have done for a crime not involving people married to each other.

Each of these differences relate, not to the issue of gender, but to the issue of marital status or the class of victims of domestic violence. While the Court does not believe any of these differences are significant, even if they are deemed so, the state need only justify the differences with a rational relationship to a legitimate state interest.

The state puts forth several justifications for any differences that may exist. These justifications fulfill the rational basis test, and reach the level of an important state objective. The first is that the criminal area may not be the best place to resolve marital problems of this sort. The government needs flexibility so that all of its resources, including mental health agencies, can rectify the situation. Often criminal sanctions alone are ineffective. Moreover, domestic violence situation are differ-

ent from other forms of criminal behavior in their complex emotional causes of behavior. History dictates that police face more obstacles and danger relating to domestic violence than certain other criminal activity. The government need not treat cases as the same, because it would be unproductive, and possibly counter-productive, to do so. These justifications are adequate to explain any differences in reaction that police departments may exhibit in domestic violence situation. Particularly, as here, where the police in fact did respond and attempt to meet the problem on those occasions when they were called upon to respond.[4] Therefore, Plaintiff's Equal Protection Claims are DENIED.

### CONCLUSION

The state has no substantive duty under the Due Process Clause to protect a citizen from private violence. Although, in this case, a protective order created a duty to protect an individual in the Cambridge Police Department, the duty is one of reasonable protection. Moreover, there is no indication of a policy that recklessly disregards the rights of Plaintiff. The police acted reasonably in this case, thus there is no Due Process violation. All state services must be equally provided, and the Court finds no significant differences in the manner in which the police responded to these domestic violence cases. Even if such differences exist, the government adequately addresses them.

Consequently, Defendants' motion for summary judgment is GRANTED. This case is, therefore, dismissed without prejudice.

IT IS SO ORDERED.

---

**4.** A municipality cannot be liable, through a *respondeat superior* theory, when a Plaintiff sues its agent in an individual capacity, *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1984), unless the Plaintiff can show that the alleged violation implements a policy or custom promulgated or observed by the municipality. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1977). Thus, in the case at bar, Plaintiff is precluded from holding the City of Cambridge responsible for the actions of its agents, because she failed to show such a policy existed. Although this analysis is rendered moot by the above Constitutional discussions, Plaintiff's claims would fail on these grounds as well.