**Vergilio CELLINI, Personal Representative for the Estate of Nancy Domm, Deceased, Plaintiff,**

v.

**CITY OF STERLING HEIGHTS, Department of Police, Officers Bentz and Lipa, and Police Chief Allan A. Nalepa, Defendants.**

Civ. No. 92–77178.

United States District Court,
E.D. Michigan,
Southern Division.

June 30, 1994.

---

Richard A. Soble, Detroit, MI, for plaintiff.

Timothy Young, Livonia, MI (Paul J. O'Reilly, of counsel, Sterling Heights), for defendants.

### MEMORANDUM AND ORDER

COHN, District Judge.

#### I.

This is a civil rights case. 42 U.S.C. § 1983 and pendent state claims. Plaintiff

Virgilio Cellini (Cellini), the representative for the estate of Nancy Domm (Domm), brings this action against the City of Sterling Heights (Sterling Heights), the Department of Police (Police Department), Chief of Police Allen A. Nalepa (Nalepa), and Officers Bentz and Lipa,[1] alleging that a police policy of treating domestic assault cases differently than other assaults constituted a violation of Domm's civil rights under the United States and Michigan constitutions, violated Michigan's Elliott–Larsen Civil Rights Act (Elliott–Larsen), and ultimately led to her death. Now before the Court is defendants' motion for summary judgment as to all claims. For the reasons that follow, the motion will be granted in part and denied in part.

#### II.

In the six months preceding Domm's death, she contacted the police department to report abusive acts of her husband, William Domm, on five separate occasions. On June 18, 1989, the Sterling Heights police were summoned to the Domm residence. The report filed following the incident stated:

> The Domms had a disagreement while at a wedding tonight and William hid Nancy's car. William has been drinking. The couple could not agree on who would leave tonight. No ass[a]ults have taken place— we left and advised them to avoid each other and call Sterling Heights Police Department in the event of any violence taking place.

Less than one month later, on July 10, 1989, the police were again called to the Domm residence. The police report filed following this incident stated in part:

> I met William outside with Nancy coming to the front door. William stated that

---

**1.** Claims against Bentz, Lipa, and Nalepa in their official capacities, and against the Department of Police, are simply alternative ways of pleading a claim against Sterling Heights. *See Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978) (noting that official capacity actions "generally represent only another way of plead-

ing an action against an entity of which an officer is an agent"); *Marchese v. Lucas*, 758 F.2d 181, 189 (6th Cir.1985), *cert. denied, County of Wayne v. Marchese*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987) (holding that the relationship between the Sheriff of Wayne County and the county itself was so close as to render the county liable for the Sheriff's actions).

he and Nancy were arguing with Nancy giving William the finger. William then gave Nancy the finger holding it against her face.

Nancy ... told me that she was assaulted in the face by her husband William.... [S]he stated that she wasn't struck, she had her face held by William's hand. She stated that she had marks on her face from the assault and wants them recorded on the police report. She showed me two places on her face. Neither place had any marks on them.

Neither party wanted to leave the home with William stating that Nancy frequently called the police on their family troubles.

Nancy again asked if I was going to record her marks on the police report. I advised her that no marks were seen and that I would record each side's story. She then became irate telling me that I have no concern for her safety by not indicating the marks (that were not there).

The officer advised Domm to leave her home if she feared for her safety. The officer reported that Nancy drove up to him after he had left the house and told him that she was leaving her home, asking him to record her leaving in the police report. The officer wrote:

It was obvious that Nancy's main concern in calling the police was to record actions that she stated happened for future civil actions.

On November 14, 1989, Domm went to the police station to make a report. The police report of her visit states:

Nancy ... entered the station to report that her car ... had been vandalized, someone had pulled the wires from the distributor cap and made her car alarm inoperable. Nancy's husband, William ..., later admitted to pulling the wires because he felt Nancy was becoming too independent. Nancy requested [that a] report be made since she is beginning divorce and injunction procedures. No further action necessary.

One week later, on November 21, 1989, the police were again called to the Domm resi-dence. Bentz responded to the call. The police report completed by Bentz states:

Mrs. Domm said her husband William grabbed her by the arm. She felt he might throw her down. Mr. Domm said he was upset because he was served with divorce papers shortly before.

The above case is the preliminary papers just filed by Mrs. Domm's attorney. The Court said that both Mr. and Mrs. Domm be restrained from harassing, assaulting and battering each other.[2] Mrs. Domm had no vis[i]ble injury(s).

In his deposition, Bentz said that William Domm "obviously ... was upset; he was crying and hugging his kids." Bentz did not ask Domm if she wanted to file an assault charge with the prosecutor's office.

The following day, Domm went to the police station to make a report as to what had happened on November 21. Lipa took her report. The police report of her visit, completed by Lipa, states:

William received his divorce papers, and began drinking. William began yelling at Nancy, but Nancy refused to talk to William. William then hit Nancy on top of her head with a fist. Nancy did not seek treatment at the hospital. Nancy was advised to consult her attorney.

On November 23, 1989, the operations officer who had worked with Lipa on November 22 filed a supplemental report concerning Domm's report of November 22. The supplemental report repeated that Domm said her husband had struck her with his fist, and added that Domm did not have "any noticeable injury," and that she said she had not sought any treatment. The supplemental report goes on to state that Domm refused to accept phone numbers or addresses of counseling and shelter services. Domm reportedly asked Lipa for an explanation of a criminal injunction, and said that her attorney "advised her that he would be obtaining one." Lipa reportedly explained how a criminal injunction works, and advised Domm to consider moving out of her home "if she felt her husband was violent." Domm reportedly replied that her attorney advised her not to

---

2. The record does not contain any such protec-tive order.

leave the home in order that she not lose rights to the home in her divorce proceedings. The report concludes:

> Mrs. Domm did not appear distressed during her visit. She expressed no fear of going back to her residence nor did she ask for anything other than for a report to be made.

On November 23, 1989, Domm's parents went to her home and found Domm and her husband dead of gunshot wounds. Upon their arrival, the police found the Domms's two children dead upstairs in their bedrooms. William Domm had killed his wife and two children before turning his gun on himself.

### III.

The complaint contains four counts:

Count I. Violation of the Michigan Elliott–Larsen Civil Rights Act;

Count II. Violation of Article 1 § 2 and Article 1 § 17 of the Michigan Constitution:

  A. Denial of equal protection of the laws;

  B. Denial of due process of law;

Count III. Violation of 42 U.S.C. § 1983, premised on Fourteenth Amendment violations:

  A. Denial of equal protection of the laws;

  B. Denial of due process of law.

Count IV. Gross Negligence on the part of Bentz and Lipa

Cellini admits in his response to the motion for summary judgment that the gross negligence claim is barred as a matter of law.

The complaint explicitly bases the equal protection claims on gender-based discrimination, but Cellini's response to the motion for summary judgment clarifies that "[t]he foundation of Plaintiff's equal protection claim is the failure of the police to provide protection to the victims of domestic violence." The Court will therefore evaluate the equal protection claims as based on a claim that the police department treated domestic assaults differently than other types of assaults, rather than on gender discrimination.[3]

### IV.

### A.

In his response to the motion for summary judgment, Cellini does not address defendants' argument that the due process claims under the United States and Michigan constitutions are barred by *DeShaney v. Winnebago County,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). *See also, Gilchrist v. City of Livonia,* 599 F.Supp. 260 (E.D.Mich. 1984) (discussing due process claims based on failure to arrest). Because Cellini appears to have abandoned the due process claims, they will not be considered at length here. In *DeShaney,* the Supreme Court wrote that "[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. at 197, 109 S.Ct. at 1004.

While the Supreme Court recognized in *DeShaney* that an affirmative duty to provide adequate protective services may arise out of certain "special relationships," Cellini has not alleged facts showing such a special relationship. The special relationship giving rise to an affirmative duty of the government to provide adequate protective services exists when the government through its own actions has placed an individual in a position not to be able to care for himself. *Id.* at 200, 109 S.Ct. at 1005–6. If the government has not imposed limitations on an individual's freedom to act on his own behalf, the Due Process Clause creates no affirmative duty specifically to protect the individual:

> The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.... In the substantive due process analysis, it is the State's affirmative act of restraining the individual's

---

**3.** The Court expresses no opinion as to whether a gender-based equal protection claim can be made out after the completion of further discovery. *See infra* note 7, at 10.

freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to protect his liberty interests against harms inflicted by other means.

*Id.* (citations and footnotes omitted). Because Cellini has not shown that the police department imposed any restraint on Domm's personal liberty that could serve to trigger the protections of the Due Process Clause, the due process claims will be dismissed.

**B.**

Cellini's equal protection claims under the United States and Michigan constitutions are based on "the failure of the police to provide protection to the victims of domestic violence." "Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection." *Watson v. City of Kansas City,* 857 F.2d 690, 694 (10th Cir.1988); *Bartalone v. County of Berrien,* 643 F.Supp. 574, 577 (W.D.Mich.1986). Because the Michigan equal protection clause, Const.1963, Art. 1, § 2, secures the same rights as does its counterpart in the Constitution of the United States, *Fox v. Employment Security Comm.,* 379 Mich. 579, 588, 153 N.W.2d 644 (1967), Cellini's equal protection claims will be considered together here.

**1.**

■ Under *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a local governing body can be liable under 42 U.S.C. § 1983 "where ... the action that is alleged

to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. at 2035–36. Local governments are also liable under § 1983 for constitutional deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 691, 98 S.Ct. at 2019.

■ The equal protection clause operates to bar discrimination or disparate treatment based on classifications that are not rationally related to a legitimate government purpose. *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 55, 93 S.Ct. 1278, 1308, 36 L.Ed.2d 16 (1973).[4] Here, defendants deny that Sterling Heights has a policy of treating domestic assault cases differently than other criminal assaults. Defendants further argue, based on *Siddle v. City of Cambridge,* 761 F.Supp. 503, 512 (S.D.Ohio 1991), that even if there were a policy of treating domestic assaults differently than other assaults, the different treatment would be rationally related to legitimate governmental interests.

**a.**

In support of their claim that Sterling Heights did not treat domestic assault cases differently than other types of assaults, defendants point to a Sterling Heights Police Department General Order issued January 30, 1990 (the "General Order"), setting out guidelines to be followed in responding to domestic disturbances. The General Order is not relevant to this case, because all the events on which this case is based took place in 1989, before the General Order was issued.[5]

4. Gender-based classifications must bear a substantial relationship to an important governmental objective in order to pass muster under the equal protection clause. *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456–57, 50 L.Ed.2d 397 (1976), *reh'g denied,* 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977). Because Cellini's equal protection claims here are based on membership in the class of victims of domestic violence, rather than on gender, they are evaluated under the rational relationship standard. The Court recognizes, though, that most domestic assault is committed by a male partner against a

female partner. *See* Leeds, *Family Offense Cases in the Family Court System: A Statistical Description,* Henry Street Settlement Urban Life Center, Nov. 1978, p. ii, cited in *Thurman v. City of Torrington,* 595 F.Supp. 1521, 1528, n. 1 (D.Conn.1984) (stating that "in 29 out of every 30 such cases the husband stands accused of abusing his wife.")

5. The Court expresses no opinion as to whether the General Order would serve to show that Sterling Heights did not have a policy of treating domestic assaults differently than other assaults.

■ Cellini cites the deposition testimony of Bentz, Lipa, and Nalepa in support of his contention that Sterling Heights treated domestic assaults differently than other assaults. All three officers testified that prior to 1990 the policy of the police department with regard to spouse abuse or domestic disturbances was not to arrest for misdemeanor assault unless the assault was committed in an officer's presence.[6] While Cellini has not put into the record the police department's policy for handling assaults that did not take place in the context of domestic disturbances or spouse abuse, the Court assumes that it was not the policy of the police department never to arrest for misdemeanor assaults not committed in the presence of an officer.[7]

■ Defendants also rely on M.S.A. § 28.-874(1) [M.C.L.A. § 764.15(1)] concerning arrest without warrant in cases of domestic assault, to argue that the officers who responded to Domm's calls did not have authority to arrest William Domm. M.S.A. § 28.874(1) [M.C.L.A. § 764.15(1)] provides that a peace officer may make an arrest without a warrant if she has "reasonable cause" to believe that an assault of a spouse, former spouse, or household member has taken place, "irrespective of whether the violation was committed in the presence of the officer." On its face, this statute does not justify a policy of arresting only when an assault has taken place in the presence of the officer.[8] Cellini has presented sufficient evidence to preclude summary judgment on the issue of whether Sterling Heights had a policy of treating domestic assaults differently than other assaults.

b.

Defendants argue that a policy of treating domestic assaults differently than other assaults, if it existed, would be justified as rationally related to legitimate governmental interests. Defendants cite *Siddle v. City of Cambridge,* 761 F.Supp. 503, 512 (S.D.Ohio 1990) in support of their argument:

> The state puts forth several justifications for any differences that may exist. These justifications fulfill the rational basis test and reach the level of an important state objective. The first is that the criminal area may not be the best place to resolve marital problems of this sort. The government needs flexibility so that all of its resources, including mental · health agencies, can rectify the situation. Often criminal sanctions alone are ineffective. Moreover, domestic violence situation[s] are different from other forms of criminal behavior in their complex emotional causes of behavior. History dictates that police face more obstacles and danger relating to

---

6. Bentz also testified that he cannot recall ever making a domestic violence arrest.

   Cellini argues that his equal protection claims are supported by Sterling Heights's failure adequately to train its officers. Cellini says that Lipa testified to never having received training specifically directed toward domestic violence, and that Bentz testified to having attended two seminars that focussed on "defusing" domestic violence situations rather than making arrests. Cellini failed to provide the Court with relevant portions of the officers' deposition testimony to support his assertions. In the absence of any support in the record for his assertions, Cellini's arguments regarding a failure to train basis for his equal protection claims are not a ground for denying defendants' motion for summary judgment.

7. Defendants point out that Cellini has not provided statistical evidence of a policy of disparate treatment of domestic assault cases. The yearly summaries provided to Cellini by plaintiffs, though, do not contain the information necessary to develop such statistical evidence. The summaries do not include a discrete category for domestic assault, do not disclose how many "incidents" resulted in arrests, and do not disclose the gender of the assault victims. Meaningful statistical evidence in support of Cellini's claim cannot be developed without such information. Cellini is therefore granted access, subject to an appropriate protective order, to the police records necessary to perform a statistical study in support of his equal protection claim, examining disparities in treatment of assault complaints based on the gender of the complainant and whether or not the assault occurred in a domestic context.

8. *Defendant's also point to an Attorney General's opinion interpreting* M.S.A. § 28.874(1) [M.C.L.A. § 764.15(1)] *as requiring corroborating physical evidence in addition to the complaining victim's statement to meet its "reasonable cause" standard.* O.A.G., *1985–1986, No. 6296, p. 1170 (May 21, 1985). The Court will not to rule on the current record that the officers had no authority to arrest William Domm.*

domestic violence than certain other criminal activity. The government need not treat cases as the same, because it would be unproductive and possible counter-productive, to do so. These differences are adequate to explain any differences in reaction that police departments may exhibit in domestic violence situation[s].

*Id. Siddle* is unpersuasive in the context of this case.

While it is beyond question that police need not treat different cases as the same, there still must be a rational relationship between the specific policy adopted and a legitimate governmental interest. Here, the alleged specific policy is one of never arresting in a domestic assault case for misdemeanor assault unless a police officer witnessed the assault. Defendants have not offered any explanation of what governmental interest is served by requiring an officer to have witnessed a domestic misdemeanor assault before making an arrest. The most obvious explanation for such a policy is that Sterling Heights considers a misdemeanor assault less serious when the victim is the assaulter's spouse. Absent an explanation of the governmental interest served by Sterling Heights's policy, defendants fail to satisfy even the relatively permissive rational relationship requirement of the equal protection clause. Such an unexplained discrepancy in the treatment of victims of domestic assault could legitimately give rise to an inference that the police department acted with discriminatory motive in employing its domestic assault policy. *See Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (discussing the requirement of discriminatory intent or purpose in the context of racial discrimination). Cellini's equal protection claims cannot be disposed of on summary judgment.

### 2.

■ Bentz, Lipa, and Nalepa have all moved for summary judgment as to the claims against them in their personal capacity on the basis that they are entitled to qualified immunity. Public officials carrying out executive responsibilities, such as police officers, are entitled to qualified immunity from personal liability for money damages.

Under the doctrine of qualified immunity, such an official will not be found personally liable for money damages unless the official's actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The "clearly established" rights allegedly violated by the official cannot be considered at an abstract level, such as the right to enjoy equal protection under the law, but must be approached at a level of specificity:

> [T]he right the official is alleged to have violated must have been "clearly established" in a ... particularized ... sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

The Court of Appeals for the Sixth Circuit has elaborated on what sort of authority serves to make a specific right "clearly established:

> [I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals, or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law" these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting. Here a mere handful of decisions of other circuit and district courts, which are admittedly novel, cannot form the basis for a clearly established constitutional right in this circuit.

*Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177–78 (6th Cir.1988).

■ Here, the conduct complained of does not meet the objective "clearly estab-

lished law" test for avoiding qualified immunity. The authorities cited by Cellini in support of his equal protection arguments, though instructive, constitute the sort of "handful of decisions of other circuit and district courts" that the Sixth Circuit has found insufficient to create a clearly established constitutional right. This result is further supported by the circumstance that the only case on point decided by a court in this circuit, *Siddle* (S.D.Ohio), held that disparate treatment of domestic assault claims did not give rise to an equal protection claim. Defendants' motion for summary judgment will therefore be granted as to Bentz, Lipa, and Nalepa in their personal capacities.

### C.

Defendants have moved for summary judgment as to Cellini's claim under Michigan's Elliott–Larsen Civil Rights Act. Defendants' sole argument for dismissal of the Elliott–Larsen claim is that the claim is "identical to Plaintiff's equal protection claim." Defendants concede that the language of the Elliott–Larsen Act "appears to grant authority for Plaintiff's claim,"[9] but argue that the claim is identical to the equal protection claims, which defendants say should be dismissed. Because the Court finds that Cellini's equal protection claims should not be dismissed here, it rejects defendants' argument.[10]

### V.

For the reasons stated, defendants' motion for summary judgment is GRANTED as to Count IV (gross negligence) and as to Counts I, II, and III with regard to Bentz, Lipa, and Nalepa in their personal capacities. The motion is DENIED as to Counts I, II, and III with regard to the City of Sterling Heights without prejudice to renewal at a later date after Cellini has completed the statistical study described above at note 7, p. 10.[11]

SO ORDERED.

---

9. The Elliott–Larsen Act, at M.S.A. § 3.548(302) [M.C.L.A. § 37.2302], entitled Prohibited Conduct, states:

Except where permitted by law, a person shall not:
(a) Deny an individual the full and equal enjoyment of the goods services, facilities, privileges, advantages, or accommodations of a place of accommodation or public service because of religion, race, color, national origin, age, sex, or marital status.

As used in the relevant article,
"Public Service" means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof, or a tax exempt private agency established to provide service to the public. M.S.A. § 3.548(301)(b) [M.C.L.A. § 37.2301(b)].

10. More generally, it is possible that a claim which does not create a cause of action under the equal protection clause could still be actionable under Elliott–Larsen.

11. Any dispute over discovery in connection to the statistical study should initially be brought before the Court informally.