Salvatore MARCHESE,
Plaintiff-Appellee,

v.

William LUCAS, Individually and as Sheriff of Wayne County, Michigan, and The County of Wayne, Jointly and severally, Defendants-Appellants.

No. 83–1001.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1984.

Decided April 3, 1985.

As Amended on Denial of Rehearing and Rehearing En Banc July 3, 1985.

William B. McIntyre, Jr., George H. Cross, Richard Kudla, argued, Detroit, Mich., for defendants-appellants.

Deborah Gordon, argued, Detroit, Mich., for plaintiff-appellee.

Before EDWARDS * and KRUPANSKY, Circuit Judges, and PECK, Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Circuit Judge.

This is an appeal from a judgment for $125,000 entered in the United States District Court for the Eastern District of Michigan, Judge Julian A. Cook, Jr., presiding, based upon a jury verdict in favor of plaintiff Marchese against William Lucas in his official capacity as Sheriff of Wayne County, and against the County of Wayne. The suit was based upon 42 U.S.C. § 1983. The cases in the United States Supreme Court which appear to establish decisional principles on the issues of this case are *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561

_____
* Honorable George Edwards took senior status    January 15, 1985.

(1976). Directly applicable to this case is a very recent decision in *Brandon v. Holt,* —— U.S. ——, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). *See also: Black v. Stevens,* 662 F.2d 181, 191 (3rd Cir.1981), and *Leite v. City of Providence,* 463 F.Supp. 585, 590–91 (D.R.I.1978).

The first issue presented by this case is whether or not § 1983 creates an action for damages on the part of a prisoner lawfully arrested and in custody when, as this jury found on substantial evidence, he was twice beaten severely while in the custody and complete control of sheriff's officers. The second important question is, assuming an affirmative answer to the first, does such liability extend to the Sheriff, the commanding officer of the law enforcement unit involved here in his official capacity either because of the Sheriff's prior failure to train and discipline his force or because of ratification of the illegal acts found by the jury through failure to investigate and determine and punish the individual officers concerned, thus ratifying their acts. The third issue concerns whether, as found below, Wayne County could be held to be jointly liable with the Sheriff as the unit of local government which finances the Sheriff's Department and/or because the Sheriff makes police policy for the County. In this opinion we answer all three of the questions in the affirmative. Our holding as to County liability is based upon the fact that under the Michigan Constitution, the Sheriff makes police policy for the County.

The facts in this case are dramatic no matter which party is reciting them. Plaintiff was apparently a dope addict. After injecting heroin, he was arrested in a Wayne County park by a deputy sheriff named Swamba. When the deputy ordered him out of the car he was seated in, Marchese reached under the car seat and brought up a gun which he pointed at Deputy Swamba.[1] Swamba dove for the gun and secured it. With the assistance of

another deputy named Siemienski who had arrived on the scene and a passing civilian with a golf club, Marchese was seized, handcuffed, and placed in a squad car.

There is no doubt that Marchese was injured to some degree in the encounter with the two deputies (and the civilian who went to their aid) while they were engaged in the initial arrest. We emphasize, however, that the facts, which led to the jury award, do not include those which have just been recited.

The two episodes upon which plaintiff asserts and the jury found liability, are as follows:

Deputies Swamba and Siemienski took Marchese to the Wayne County Sheriff's Department Road Patrol Station on Henry Ruff Road in Westland, Michigan. At the entrance to the station, Marchese was greeted by a group of angry deputies with shouts of "cop killer." Marchese's testimony indicates that he was frightened and, although handcuffed, attempted to flee. He was quickly recaptured and thereafter, he asserts, was beaten by various officers as he was taken into the station house.

Marchese was booked and locked in a cell in the station house. He was allowed to see a lawyer named Mogill.

The second episode occurred that night. Marchese's testimony is that, after he had been locked in a cell at some time close to midnight, a deputy having possession of the key to his cell opened the door and admitted to the cell someone who attacked him, beating him violently with some hard object. His testimony was as follows:

Q Mr. Mogill left; would that be correct?

A Oh, yes. It was later on in the afternoon.

Q What happened next?

A After I was in my cell, I laid down for awhile, just sat there. I was try-

---

[1] Marchese was punished with due process of law for this conduct. He pled guilty to felonious assault and was sentenced to a term of 3 to 4 years. He served a total of 32 months in the Michigan Prison system. He was deported to Canada upon his release. The jury in this case was fully aware of Marchese's conviction and sentence. The initial complaint in our instant case was filed pro se while Marchese was in prison.

ing to figure out what was going on, what was happening to me. Every once in a while I'd just hear laughter and someone yelling at me or taunting me, threatening me.

I laid there until late—until it got dark.

After it started getting dark, I heard the jingle of some keys coming down the hallway.

Q  Were you sleeping at that time or had you been at all?

A  I was trying to sleep, but I was just laying there.

Q  How long had it been dark at that time, approximately?

A  A few hours.

Q  Would this be late at night, then?

A  Yes.  It would have been late at night.

Q  What was the first thing you heard?

A  I just heard the jingling of keys was the first thing I heard.  Then I heard my door open.

Q  The door to your cell?

A  To my cell.

Q  Did you hear any voices?

A  No.  I didn't hear any voices at all.

Q  Did you hear any other sound?

A  Just the keys and the door opening.

Q  Okay.  You were alone in your cell at that time?

A  That's correct.

Q  Okay.  What was the next thing that occurred?

A  Well, this deputy let somebody into my cell.  The guy that he let in just dragged me in off the bench and started hitting me with something in the face, in the chest, started hitting me repeatedly, and I started yelling to find out what was going on.

I thought they didn't know what was happening.  This guy just kept hitting me with something in his hand.  He didn't say nothing.  He kept punching and punching and hitting me with something in his hand and I started yelling, and I heard laughter coming from outside the corridor.

Q  What did you do other than yell?

A  That's all I could do.  My wrists were sore from earlier.  I was pretty exhausted from the whole day.

Q  Did you resist the beating?

A  I resisted as much as I could, which wasn't too much by that time.  Whatever he hit me with in the face the first time just took a lot of the fight right out of me.

Q  About how long did the beating go on?

A  Quite a few minutes.

Q  What was the next thing that occurred?

A  The deputy came back and took the other person in the cell out of the cell and they both walked away and all I heard was some chuckling.

Q  What was your physical condition at that time?

A  Exhausted, sore and a lot of pain.  My head was throbbing.  My wrists were sore.  My groin was sore, and I had just—I just about passed out.  As a matter of fact, I think I did pass out.

Q  Were you bloody at that time, did you notice?

A  I didn't notice if I was bloody or not.  There was no light.  I couldn't see where there—there was no lights on where I was, so I couldn't see anything.

Q  So the cell area was completely dark at that time?

A  Yes, it was.

Q  Okay.  You said you passed out?

A  Yes, I did.

The testimony presented by defendants concerning Marchese's accusations of being beaten at the entrance to the station and in his jail cell essentially implied that no such events occurred.

Obviously, however, the jury chose to believe the beatings did occur, and our reading of this record leaves us in no doubt that there was evidence from which the jury could properly have reached that conclusion.  In fact, items of evidence from the defendants' side of the case tend to

support Marchese's story of the midnight assault. The shift commander at the station house on the night concerned, Lieutenant McLogan, testified that there was "an air of hostility" among the sheriff's officers toward Marchese on the night when he testified he was beaten. Lieutenant McLogan also testified that access to Marchese's cell could only be gained by use of the key which was in the shift officer's control and possession. Further one of the original arresting officers, Deputy Siemienski, testified on a deposition which was read to the jury that a detective in charge of the case had told him (Siemienski) that Marchese had been "worked over the night before."

The jury also heard testimony by Deputy Alcorn (also by deposition read into the record) that he "sure wouldn't tell anybody" if he had beaten the prisoner. Considerably more specific and completely uncontroverted evidence came out of Marchese's appearance before a state District Court Judge the following morning. In these state court proceedings Marchese was represented by Attorney Mogill who, at trial of the instant case, before the federal District Court, placed in the record a description of Marchese's condition as he appeared at the state court arraignment:

[Attorney Mogill]

A  I advised the Court that on the previous afternoon I had noted a number of bruises and lacerations about Mr. Marchese's body, and then I advised the Court that his condition that morning, the 15th, was substantially different than when I had seen him the previous day.

He did not have a black eye, he did not have blood on his shirt; that on this morning, the next morning, however, that he had what I described at that time as a terrible black eye, his left eye, that—I believe it was the left eye, his mouth was swollen, that blood was over his shirt as a result of bleed-

ing from the head and that I asked for medical attention.

Q  Did you advise the Court as to how these injuries had occurred?

A  Well, according to the transcript here, I indicated only that—"whether it was through negligence or intentional acts, somebody between yesterday evening and this morning has assaulted [Mr. Marchese] [2] while in the custody of the Wayne County Sheriff's."

Q  Did you, during that proceeding, ask the Court to take any action or ask for medical treatment for your client?

A  Yes.

Q  What specifically did you request or ask for?

A  On page 7 of the transcript, it indicates that I had another matter to bring up to the Court; I would like to obtain medical assistance and whether or not the facilities were available within the Sheriff's Department. I wanted to see to it that they weren't—that the Court—

Q  In your opinion, did your client need medical assistance at that time?

A  Very clearly, yes.

The state District Court Judge, observing Marchese's condition, ordered the Sheriff's representative present at the hearing, to initiate an investigation of who and what had produced his injuries.[3]

The Sheriff's subsequent failure to order and direct an investigation which disclosed exactly who were the perpetrators of these brutal violations to the U.S. Constitution and to administer censure and punishment served to confirm the existence of an unstated "policy" of toleration of illegal brutality toward any county prisoner who had threatened the life of a sheriff's deputy.

**The Law Applicable To This Case**

The underlying law applicable to this case is contained in two amendments to the Constitution of the United States—particu-

---

2. Attorney Mogill at this point used the name "Taveroni" under which Marchese was registered after his arrest.

3. The Sheriffs representative, Detective Paterson, was also the officer who informed Deputy Sieminski that Marchese had been "worked over the night before."

larly in the guarantee of "due process of law" recorded in the Fifth and Fourteenth Amendments. The due process clause of the Fifth Amendment, of course, antedated the admission of the State of Michigan to the Union and was accepted by Michigan when it entered the Union.

The Fifth Amendment in applicable part provides: "nor be deprived of life, liberty or property without due process of law."

The Fourteenth Amendment in applicable part provides: *"nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."* (Emphasis added.)

This case is brought under 42 U.S.C. § 1983 which in applicable part provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The facts in this case are close kin to those cases notorious in American law where, because helpless victims have been abused under color of legal authority, the Supreme Court has granted relief in one form or another. *See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed.2d 183 (1952); *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed.2d 682 (1936); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

Several of these cases involve such outrageous abuse of defenseless citizens as to "shock the conscience of the court." Applying that description to the facts of this case is, we believe, appropriate, albeit we recognize that by so doing, we do not determine the legal issues here presented.

We believe that the District Court's jury award rests upon four fundamental legal bases:

1) 42 U.S.C. § 1983.
2) The Supremacy Clause of the United States Constitution:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI.
3) *Monell's* overruling of *Monroe v. Pape.*
4) The Supreme Court's recent opinion in *Brandon v. Holt,* —— U.S. ——, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).

We believe that the fundamental case law applicable to this appeal was established some years ago by the interplay between *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 and *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611.

In *Monroe,* the Supreme Court upheld the right to sue Chicago Police Officers for violations of federal citizens' federal constitutional rights. The Court said:

There can be no doubt at least since *Ex parte Virginia* [10 Otto 339] 100 U.S. 339, 346–347 [25 L.Ed. 676], that Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it. *See Home Tel. & Tel. Co. v. Los Angeles,* 227 U.S. 278, 287–296 [33 S.Ct. 312, 57 L.Ed. 510]. The question with which we now deal is the narrower one of whether Congress, in enacting § 1979, meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position. Cf. *Williams v. United States,* 341 U.S. 97 [71 S.Ct. 576, 95

L.Ed. 774]; *Screws v. United States*, 325 U.S. 91 [65 S.Ct. 1031, 89 L.Ed. 1495]; *United States v. Classic*, 313 U.S. 299 [61 S.Ct. 1031, 85 L.Ed. 1368]. We conclude that it did so intend.

*Monroe v. Pape*, 365 U.S. at 171–172, 81 S.Ct. at 475–476.

Of particular applicability to our instant case is the Court's description of the third aim of § 1983 which was "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Id.* at 174, 81 S.Ct. at 477. Nonetheless, the *Monroe* court, while upholding plaintiff's right of action under § 1983 against the Chicago Police Officers, also held that § 1983 was not intended to grant a right of action against local units of government and hence, dismissed the suit as to the City of Chicago. *Id.* at 187–192, 81 S.Ct. at 484–487.

Seventeen years later, however, in a thorough analysis of congressional debate preceding adoption of § 1983, the Supreme Court overruled this latter holding in *Monroe*. The opinion for the Court held:

Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. As Mr. Justice Harlan, writing for the Court, said in *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 167–168 [90 S.Ct. 1598, 1613–1614, 26 L.Ed.2d 142] (1970): "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."

*Monell v. Dept. of Social Services of the City of New York*, 436 U.S. at 690–691, 98 S.Ct. at 2035–2036 (footnotes omitted).

The dispositive paragraph of *Monell* as we read it, shows that local government units can be sued and recovered against by citizens for deprivation of federal constitutional rights provided only that the local unit of government cannot be held liable solely on a theory of respondeat superior. *Id.* at 691, 98 S.Ct. at 2036.

Very recently in a case coming from this Circuit, the Supreme Court has revisited § 1983 and reaffirmed in even stronger language its *Monell* holding. In *Brandon v. Holt, supra,* the Supreme Court reaffirmed the law which has been described above as follows:

In *Monroe v. Pape*, 365 U.S. 167, 187–192 [81 S.Ct. 473, 484–487, 5 L.Ed.2d 492] (1961), the Court held that a city was not "a person" within the meaning of 42 U.S.C. § 1983. That construction of § 1983 protected municipalities from liability in cases of this kind until June 6, 1978, when we decided *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611] (1978). The complaint in this case was filed on February 22, 1978, before *Monroe v. Pape* was overruled; this explains why the city of Memphis was not named as a defendant in this case. The timing of the complaint may also explain why petitioners did not expressly allege at the outset of the litigation that they were suing Chapman in his official capacity as Director of Police of the Memphis Police Department.

The course of proceedings after *Monell* was decided did, however, make it abundantly clear that the action against Chapman was in his official capacity and

only in that capacity. Thus, in petitioners' response to a defense motion for summary judgment, petitioners' counsel stated:

"Defendant Chapman is sued in his official capacity as Director of Police Services; City of Memphis, Tennessee. '[O]fficial capacity suits generally represent an action against an entity of which an officer is an agent.... *Monell v. New York Department of Social Services,* 436 U.S. 658, 690 n. 55 [98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611] (1978).' "

The point was reiterated in counsel's opening statement, in the trial court's evidentiary rulings, in the findings on liability, and in the proceedings relating to damages in which it was recognized that our decision in *Newport v. Facts Concert, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), precluded an award of punitive damages against Director Chapman.

The Court of Appeals also repeatedly noted that the suit against Chapman was "in his official capacity." Moreover, while the appeal was pending Director Chapman left office and was replaced by John D. Holt. Pursuant to Rule 43(c)(1) of the Federal Rules of Appellate Procedure, Holt was automatically substituted as a party. It is Director Holt who appears as a respondent in this Court, and there is not even an arguable basis for claiming that the record would support an award of damages against him individually.

Given this state of the record, even at this late stage of the proceedings, petitioners are entitled to amend their pleadings to conform to the proof and to the District Court's findings of fact. Moreover, it is appropriate for us to proceed to decide the legal issues without first insisting that such a formal amendment be filed; this is because we regard the record as plainly identifying petitioners' claim for damages as one that is asserted against the office of "Director of Police, City of Mamphis," rather than against the particular individual who occupied that office when the claim arose. Peti-

tioners are claiming a right to recover damages from the city of Memphis.

## II

In at least three recent cases arising under § 1983, we have plainly implied that a judgment against a public servant "in his official capacity" imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond. We now make that point explicit.

In *Monell,* the City of New York was not itself expressly named as a defendant. The suit was nominally against the City's Department of Social Services, but that department had no greater separate identity from the City than did the Director of the Department when he was acting in his official capacity. For the purpose of evaluating the City's potential liability under § 1983, our opinion clearly equated the actions of the Director of the Department in his official capacity with the actions of the City itself.

*Brandon v. Holt,* 105 S.Ct. at 876–878.

We return now to our instant case.

This case presents assaults upon a defenseless prisoner both as he was being brought into the road patrol station house with his hands handcuffed behind him and in his darkened cell near midnight when, as the jury obviously found, he was beaten with some hard object after his cell was unlocked by a key admittedly committed to the care of the duty officer. We view the key and its use in this instance as the symbol of the involvement in this assault of the defendant the Sheriff of Wayne County and the County of Wayne itself.

The evidence is such as to demand acceptance of the fact that 1) the shift officers on duty knew when this assault was going to take place, 2) heard it in progress and 3) sought to the degree possible, to cover up the attack after it occurred.

Not only do the facts show that there was official toleration, (if not complicity in instigation) of the midnight assault on the part of the command officers on duty at the station house that night; but there was also subsequent concealment followed by a complete failure to initiate and conduct any

meaningful investigation on the part of the Sheriff himself.

Careful attention to this record convinces this court that although reports concerning the evidence of Marchese's arrest and incarceration were required from the shift commanders, there was, in fact, no serious investigation conducted either by Sheriff Lucas or any of his deputies. This record does not reveal that any perpetrators were identified; or that any penalties or reprimands were ordered as to officers in charge at the times and places of the assaults.

The principal legal issues of this appeal are:

I. Whether the trial court should have granted Sheriff Lucas' motion for a directed verdict or judgment notwithstanding the verdict on 1) the failure to train and discipline his officers, and 2) the failure to investigate plaintiff's complaints;

II. Whether Wayne County should have been dismissed as a defendant, based either on an immunity conferred by Art. 7, Section 6 of the Michigan Constitution, or because the County cannot generate policy affecting Sheriff's Department operations under Michigan statutes.

At the beginning of our discussion of the law of this case, we observe that two events recorded in this trial account for the jury verdict and its award. As these events obviously shocked the conscience of this Wayne County jury, they also shock the conscience of this court. These events are 1) the attack by deputy sheriffs upon Marchese at the entrance to the Sheriff's station house on Harvey Ruff Road, and 2) the midnight assault upon Marchese in his jail cell in the station house. This record does not disclose the presence of any persons on the scene of either of these events except personnel of the Sheriff's Department. Such undisciplined conduct on the part of law enforcement officers speaks ab initio of lack of training and discipline. When joined to the fact that this record does not identify any participant in these obviously illegal assaults (although supervisory officers were present at both), the record also speaks of a failure to provide a trained and disciplined county law enforcement agency. Deputy Sieminski, Officer Alcorn, and Sergeant Robinson all testified that, at the time of the incidents in question, they had not received any training in the care, treatment, and handling of prisoners in their custody. Robinson testified that he did receive such training in 1982, six years after Marchese was beaten. (Jt. App. pp. 260–261, 360, 406–407).

At this same point, it is appropriate for us to record our full awareness that Sheriff Lucas was not on the scene at either of these two occurrences and may well not have received word of them at least until after Marchese's appearance before the state District Court on the following morning. Sheriff Lucas actually testified that he knew nothing about these matters until years later and shortly before this trial. This may be true but the Sheriff is sued here in his official capacity and in that capacity, he had a duty to both know and act.

### The Sheriff's Liability

We conclude from these facts and the law set forth above that the "official policy" of the sheriff and the County of Wayne as represented by him in police matters, 1) had not required appropriate training and discipline of his officers, and 2) where a citizen had made a life-threatening gesture by pointing a gun at a sheriff's deputy, subsequent assault by brother officers, upon a prisoner, would not engender either serious investigation to discover the perpetrators or official sanctions against their conduct. It is this latter official policy which we also regard as ratification of the illegal acts of the unidentified officers whom the jury found to have inflicted injuries upon plaintiff Marchese which plaintiff claims warranted a judgment in his favor of $125,000 from the Sheriff and the County.

### The County's Liability

The liability of the County of Wayne rests on the failures of the Sheriff which we have previously described. It is clear that under the Michigan Constitution of 1963 Art. 7, Section 6, Wayne County did not make policy for the Sheriff's Department. The Sheriff is, however, the law

enforcement arm of the County and makes policy in police matters for the County. *See* Michigan Constitution 1963 Art. 7, Section 4. The County, through its Board of Supervisors, appropriates funds and establishes the budget for the Sheriff's Department. The Sheriff is elected by the voters of Wayne County. No doubt he is responsible for enforcing state law and presumably federal law as well. But equally clearly he is not an official of the State of Michigan or of the federal government. He is, under the Constitution of Michigan, the law enforcement officer for the County of Wayne with extraordinary power to select his deputies and enforce the law.

■ We believe that the relationship between the County and the Sheriff's Department is so close as to make the County liable for the Sheriff's failure to train and discipline his officers and his ratification of the use of wanton brutality by members of his force which we have spelled out above. Obviously this holding is consistent with and indeed compelled by the U.S. Supreme Court's decision in *Brandon v. Holt, supra.* The County's reliance on Michigan law to exempt it from liability is clearly inappropriate under *Brandon* and for that matter under the federal Constitution's Supremacy Clause, *supra.*

We have, of course, reviewed the original brief and the response of defendants-appellants, County of Wayne and William Lucas in his official capacity as Sheriff of Wayne County. We agree with the County's brief to the extent that it relies upon the following paragraph from *Monell* :

> We conclude, therefore, that a local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its law makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983.

*Monell v. Dept. of Social Services of the City of New York*, 436 U.S. at 694, 98 S.Ct. at 2037.

The District Judge was well aware of the fact that liability in this case could not be found on the basis of respondeat superior and he clearly and correctly instructed the jury on this issue.

As we have previously made clear, we believe this record shows that these injuries resulted from official policy of the Sheriff of Wayne County and that the judge's charge and the jury award are consistent with *Monell.*

Our review of the record of this trial indicates that the trial judge committed no reversible error either during the trial or in the charge which he had worked out carefully with both parties to this controversy.

The judgment of the District Court is AFFIRMED.