**Levarst HULLETT Jr., Plaintiff,**

v.

**Rick SMIEDENDORF,
et al., Defendants.**

**No. 1:98–CV–273.**

United States District Court,
W.D. Michigan,
Southern Division.

June 11, 1999.

Nelson P. Miller, Fajen & Miller, Grand Haven, MI, for Levarst Hullett, Jr., pltfs.

Richard H. Winslow, Cummings, McClorey, Davis & Acho, PC, Battle Creek, MI, for Rick Smiedendorf, Steve Neubecker, City of St. Joseph, defts.

## OPINION

QUIST, District Judge.

Plaintiff, Levarst Hullett, Jr. ("Hullett"), has sued Defendants Rick Smiedendorf ("Smiedendorf"), Steve Neubecker ("Neubecker"), and the City of St. Joseph ("St.Joseph"), for violation of his civil rights pursuant to 42 U.S.C. §§ 1983, 1985, and 1986. Hullett also raises state law claims of assault and battery and gross negligence. This matter is before the Court on Defendants' Motion for Summary Judgment and Motion in Limine.[1]

### Facts

Hullett, a forty-two year old black male from Benton Harbor, Michigan, rode his bicycle to the neighboring city of St. Joseph, Michigan, the evening of March 1, 1998, to hear jazz artist Ray Silkman perform at Czar's Club in St. Joseph. Hullett left the club at approximately 2:00 a.m. to return to his home in Benton Harbor. During his ride home, Hullett pulled into an Amoco gas station, where he was found lying in the driveway by an Amoco employee. The employee called St. Joseph police at approximately 2:15 a.m. (See Dispatch Transcript, Defs.' Mot. Summ. J. Ex. 7.) At that same time, Neubecker, a white male police officer for the city of St. Joseph, arrived at the scene. A customer at the gas station told Neubecker that Hullett had fallen over the handlebars of his bike. (Neubecker Dep. at 18–19, attached to Pl.'s Br. Opposing Mot. Summ. J.) Neubecker began talking with Hullett and asked him if he could get home safely. After talking with Hullett for a moment, Neubecker concluded that Hullett was highly intoxicated and had slurred speech. (See id. at 129) Neubecker asked Hullett for identification. Hullett questioned why he needed to provide identification, but eventually produced an expired driver's license. (See Hullett Dep. at 68, attached to Pl.'s Br. Opposing Mot. Summ. J.) Neubecker then offered Hullett a ride home. (See Neubecker Dep. at 19.) Hullett insisted that he could get home fine and asked Neubecker to leave him alone. (See Videotape from Neubecker's police car, Defs.' Mot. Summ. J. Ex. 1.) Neubecker told Hullett that he wasn't being arrested and that he could leave, but advised him to ride his bike on the sidewalk because his bike did not have lights. (See Neubecker Dep. at 24.)

Neubecker decided to follow Hullett to make sure he would be safe. (See id. at 25.) Neubecker followed slowly behind Hullett with his flashing lights on to make sure that any other cars on the road would see Hullett. (See id. at 26.) Neubecker also made a call to Smiedendorf as he began to follow Hullett. (See id. at 33.)

Neubecker states that, while following Hullett, he yelled approximately eight to ten times at Hullett to ride on the sidewalk. (See id. at 26.) After Neubecker followed Hullett for a couple of minutes, Smiedendorf appeared on the scene, drove

---

1. The Court will address the merits of Defendants' motion in limine and the several motions in limine filed by Plaintiff at another time, prior to trial.

past Neubecker and Hullett on the left side of the road in a his police car and pulled in front of Hullett. (*See id.* at 34.) Smiedendorf was not communicating with Neubecker at that time. (*See id.;* Smiedendorf Dep. at 117–18, attached to Pl.'s Br. Opposing Mot. Summ. J.) Smiedendorf has indicated that he did not know whether Neubecker intended to stop Hullett. (*See* Smiedendorf Dep. at 271.)

After pulling in front of Hullett, Smiedendorf exited his police car and turned on his flashing lights. (*See* Videotape from Neubecker's police car.) Smiedendorf testified that his plan was "to grab the bicyclist off the bicycle, if that worked. Or, if not, be able to slow him down so we could on foot easily catch up and stop him and say, would you please get on the sidewalk like what we asked you to." (Smiedendorf Dep. at 134.)

Hullett swerved to the left to avoid Smiedendorf's police car. Smiedendorf then reached out toward Hullett with one arm. Smiedendorf's arm struck Hullett across the chest, causing Hullett to fall over his handlebars to the ground. (*See* Neubecker Dep. at 80–81.) Neubecker testified that he thought Smiedendorf was trying to "bear hug" Hullett, but that Hullett "was going way too fast" and "it was hard to stop him at that time." (*Id.* at 80.)

As a result of the fall, Hullett suffered abrasions to his face, arms, and legs. Smiedendorf asked Hullett if he wanted to go to the hospital. Hullett initially said no, but changed his mind and agreed to be transported to the hospital. (*See* Videotape from Neubecker's police car.) Prior to transporting Hullett to the hospital, Smiedendorf searched a bag Hullett had been carrying to see if it contained "[a]nything that could be used to hurt himself or hurt me, as I was not going to let that property be retained in his possession while sitting in the back of my car." (Smiedendorf Dep. at 190–91.)

Hullett was transported by Smiedendorf to the hospital. While Hullett was being treated at the hospital, a blood alcohol test was conducted by the attending physician, Dr. Gray. The blood alcohol test was not requested by Smiedendorf, nor was it consented to by Hullett. (*See id.* at 149–51.) Smiedendorf asked Dr. Gray if he had taken a blood alcohol test on Hullett so that he could include it in his report. (*See id.* at 147–48, 152.) Dr. Gray told Smiedendorf the results of the blood alcohol test, which indicated that Hullett had a blood alcohol level of .389 percent at 4:30 a.m. (*See* Laboratory Report, Defs.' Mot. Summ. J. Ex. 8.)

Both Neubecker and Smiedendorf wrote police reports after the incident. Smiedendorf's report indicated that Hullett had fallen after hitting a curb, leaving the inference that he had nothing to do with Hullett's fall and injury. Smiedendorf admitted that his report was misleading and inaccurate as to the cause of Hullett's fall. (*See* Smiedendorf Dep. at 175, 178.) Smiedendorf also told Neubecker what he should write in his report concerning Smiedendorf's actions. (*See* Neubecker Dep. at 64.) Neubecker admitted that the portion of his report Smiedendorf told him to add was not consistent with his observations, but was based solely on what Smiedendorf told him happened. (*See id.* at 65.)

Smiedendorf was disciplined by John Nolan, Director of Public Safety for St. Joseph. Smiedendorf was demoted from Sergeant back to a patrol officer and given a 20 day period of no work and no pay. (*See* Nolan Dep. at 43, attached to Pl.'s Br. Opposing Mot. Summ. J.) Nolan found that Smiedendorf had violated department regulations in both his treatment of Hullett and his filing a false police report. (*See id.* at 68.) Neubecker also received minor discipline for filing a false police report. (*See id.*)

After the discipline against the officers became public, a group of people marched on St. Joseph city hall, protesting the discipline against the officers. Shortly after the protests, the disciplinary action against Smiedendorf was rescinded by the city, and Smiedendorf was returned to his rank of Sergeant and awarded back pay for the time he was suspended.

## Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *See id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *See id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *See id.* at 251, 106 S.Ct. at 2511 (citing Schuylkill and Dauphin *Improvement Co. v. Munson*, 81 U.S. 442, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). The summary judgment standard mirrors the standard for a directed verdict. *See id.* at 250, 106 S.Ct. at 2511. The only difference between the two is procedural. *See id.* Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. *See id.*

■ A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; see also Frank*

v. *D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir. 1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## Analysis

### I. Federal civil rights claims

Hullett alleges that Defendants violated several of his constitutional rights. Title 42, § 1983 of the United States Code provides a mechanism for seeking redress for an alleged violation of federal constitutional rights. Section 1983 reads, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

### A. Substantive constitutional rights violated

Hullett alleges three separate violations of his constitutional rights, each of which is discussed below.

### 1. Excessive force

■ The Court held at the hearing on May 11, 1999, that Plaintiff's primary complaint, that Smiedendorf knocked him off his bicycle, stated a claim for use of excessive force under the Fourth Amendment.[2]

---

2. The Court also held that the allegation that Smiedendorf knocked Hullett off his bicycle did not state a claim for violation of Hullett's

right to travel or for violation of the Eighth or Fourteenth Amendment because the Fourth Amendment is the proper constitutional pro-

The Court held at the hearing that Hullett raised a genuine issue of material fact as to whether excessive force was used by Smiedendorf in violation of the Fourth Amendment. However, there is no allegation that Neubecker was in any way involved in the use of force against Hullett. Therefore, summary judgment will be granted in favor of Neubecker on this claim.

### 2. Unlawful search of gym bag

Hullett raises a second, distinct claim under the Fourth Amendment, namely that a bag he was carrying was unlawfully searched by Smiedendorf right before Hullett was transported to the hospital. Smiedendorf admitted that he searched his bag prior to transporting him to the hospital. (*See* Smiedendorf Dep. at 190). There is no question this action by Smiedendorf constituted a "search" governed by the Fourth Amendment, as Hullett had a reasonable expectation that the contents of his gym bag would remain private and not be subject to a search absent probable cause. *See, e.g., Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967)(Harlan, J., concurring).

■ Probable cause is generally required for a warrantless search to be reasonable. *See id.* at 357, 88 S.Ct. at 514. Probable cause to search is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In this case, because Hullett was not committing a crime at the time of the search and never was arrested, there is, at a minimum, a genuine issue of material fact as to whether Smiedendorf had probable cause to conduct a search of the gym bag.

■ However, an exception to the probable cause requirement exists when a police officer reasonably believes that the safety of law enforcement officers or the public is threatened. *See, e.g., Warden v.*

*Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967). Under those circumstances, the officer may conduct a warrantless search of any place where he believes an inherently dangerous item is present. *See Cady v. Dombrowski,* 413 U.S. 433, 448, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973).

■ The reasonableness test also applies when a police officer places an individual in his patrol car for transport. For example, the Ninth Circuit held in an unpublished opinion that a police officer's search for weapons of an individual who was not under arrest but was being transported in the police car was constitutional if the officer "had a reasonable belief that [the individual] might be armed." *United States v. Saravia–Vidana,* 923 F.2d 864, 1991 WL 3293, at *3 (9th Cir.1991)(mem. op.). The court emphasized that the officer "would not have been able to protect himself adequately if [the individual riding in the car] attacked the officer while he was engaged in driving the car and observing traffic." *Id.* The Eighth Circuit has also held that police officers may constitutionally search an individual being transported in a police car if the officers "had reasonable cause to believe that placing [the individual] in the back seat of the patrol car presented a potential danger to the officers." *United States v. Abokhai,* 829 F.2d 666, 670 (8th Cir.1987)(noting the potential danger of "the close proximity and limited observation of the [individual riding] in the back seat of the patrol car").

■ Smiedendorf testified that he searched Hullett's bag to look for "[a]nything that could be used to hurt himself or hurt me, as I was not going to let that property be retained in his possession while sitting in the back of my car." (Smiedendorf Dep. at 191.) In this case, a genuine issue of material fact exists as to whether Smiedendorf reasonably believed

vision under which to analyze Hullett's claim. *See United States v. Lanier,* 520 U.S. 259, 272

n. 7, 117 S.Ct. 1219, 1228 n. 7, 137 L.Ed.2d 432 (1997).

Hullett was armed, such that his search of Hullett's bag was reasonable.

However, there is no allegation that Neubecker was in any way involved in the search of Hullett's gym bag. Accordingly, summary judgment on this issue will be granted in favor of Neubecker.

### 3. Unlawfully obtained blood alcohol test results

Finally, Hullett complains that Smiedendorf violated his constitutional rights by asking Dr. Gray for the results of Hullett's blood alcohol test and including the results of the test in the police report. The parties agree that Smiedendorf did not request that the hospital test Hullett's blood alcohol level, but rather the hospital tested Hullett's blood alcohol level for medical purposes. The Michigan Supreme Court has held that "the Fourth Amendment [is] not implicated when defendants ha[ve] their blood withdrawn for medical treatment." *People v. Perlos*, 436 Mich. 305, 315, 462 N.W.2d 310, 314 (1990). Therefore, there was no unlawful search conducted when Hullett's blood was drawn.

However, the Court must also consider whether Smiedendorf's "request and acquisition of blood test results without a search warrant infringed on [Hullett's] Fourth amendment privacy interests." *Id.* at 316–17, 462 N.W.2d at 315. "The ultimate question [under the Fourth Amendment] is whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances." *Rakas v. Illinois*, 439 U.S. 128, 152, 99 S.Ct. 421, 435, 58 L.Ed.2d 387(1978)(Powell, J., concurring).

Michigan law generally prevents a physician from disclosing information acquired in providing medical treatment to a patient. *See* M.C.L. § 600.2157. However, after extended analysis, the Michigan Supreme Court in *Perlos* concluded that an individual does not have a reasonable expectation of privacy in the results of a blood alcohol test taken for medical purposes when that individual was involved in an automobile accident. The court empha-sized that the Michigan legislature indicated that "when people drive, they encounter a diminished expectation of privacy." *Perlos*, 436 Mich. at 327, 462 N.W.2d at 320. The court also emphasized the "strong public interest" in curtailing drunken driving that was recognized in the Michigan implied consent statute, M.C.L. § 257.625a. *See id.* However, the court noted that this statute "under narrowly defined circumstances ... created a minor exception to the physician-patient privilege." *Id.* at 328, 462 N.W.2d at 328.

■ There are several important differences between blood alcohol results obtained after an automobile accident and this case. First, the implied consent statute does not apply in this case because a bicycle is not a "vehicle" governed by the implied consent statute and Hullett was not involved in an "accident" in the common sense of the word. *See* M.C.L. §§ 257.79, 257.625a. Furthermore, it is not a crime to operate a bicycle while intoxicated. Therefore, Smiedendorf did not have the same public interest at stake to justify the invasion of Hullett's privacy that the government had in *Perlos*. Accordingly, the Court concludes that there is a genuine issue of material fact as to whether the intrusion into Hullett's privacy by Smiedendorf in requesting Hullett's blood alcohol level from Dr. Gray was reasonable in light of all the surrounding circumstances.

However, there is no allegation that Neubecker was in any way involved in the request for Hullett's medical information at the hospital. Therefore, summary judgment on this claim will be granted in favor of Neubecker.

### B. Conspiracy

Count IV of Hullett's Second Amended Complaint alleges that Defendants engaged in a conspiracy to violate his rights and to cover up their violation of his rights. Specifically, Plaintiff argues in his opposition brief that the conspiracy was the agreement between Smiedendorf and

Neubecker to falsify the police reports "to conceal that Sergeant Smiedendorf had violated Mr. Hullett's civil rights." (Pl.'s Br. at 12.)

 It is well established that a plaintiff must allege that the conspiracy deprived the plaintiff of a civil right. The conspiracy is not, of itself, a violation of a plaintiff's civil rights. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970); *Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980). Hullett agrees, noting in his brief that the filing of a false police report provides the basis for a constitutional claim "when the falsified report leads to an unconstitutional deprivation of life, liberty or property." *White v. Tamlyn,* 961 F.Supp. 1047, 1056 (E.D.Mich.1997)(citing *Landrigan* ). However, Hullett fails to allege *any* constitutional right that was violated by the alleged falsification of police reports by Smiedendorf and Neubecker. Instead, Hullett merely argues that the investigation of the incident was delayed for two weeks because of the conspiracy, causing him "substantial emotional distress." (Pl.'s Br. Opposing Mot. Summ. J. at 13.) Hullett also argues that the false information in the police reports "humiliated, defamed, and generally vilified" him. (*Id.*) However, these are not constitutional claims by Hullett. Accordingly, because Hullett has not alleged that the conspiracy between Smiedendorf and Neubecker to falsify police reports caused the violation of his constitutional rights, summary judgment on the conspiracy claim must be entered in favor of Defendants.

## C. Municipal liability

 Hullett has also sued the City of St. Joseph for these alleged violations under 42 U.S.C. § 1983. It is well established that St. Joseph cannot be held liable under § 1983 for the actions of Smiedendorf on a theory of respondeat superior or vicarious liability. *See Monell v. Dept. of Soc. Servs. of City of New York,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). In order to state a § 1983 claim against a municipality, a plaintiff must prove that the municipality established a policy or custom that was "deliberately indifferent" to a third party's constitutional rights. *See City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). " 'Deliberate indifference' is a stringent standard, requiring proof that the government entity disregarded a known or obvious risk." *Patterson v. City of Cleveland,* 173 F.3d 429, 1999 WL 68576, at *3 (6th Cir. 1999)(per curiam).

 "A plaintiff can establish the existence of a municipal policy or custom in two ways: (1) a decision-maker with final authority regarding the matter at hand issues an official proclamation, policy, or edict; or (2) a custom is established through a course of conduct when, though not authorized by law, such practices of municipal officials are so permanent and well settled as to virtually constitute law." *Hilliard v. Walker's Party Store, Inc.,* 903 F.Supp. 1162, 1179 (E.D.Mich.1995)(mem. op.).

The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton,* 489 U.S. at 385, 109 S.Ct. at 1203. The plaintiff " 'must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.' " *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir.1987)(quoting *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984)(en banc). In other words, the plaintiff must show that the policy was "the moving force of the constitutional violation . . . ." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2038.

Hullett alleges that St. Joseph's custom of "dilatory investigation of its officers, [ ] refusal to discipline its officers, [ ] failure to train and supervise its officers, and [ ] acquiescence in the custom of its officers to use excessive force against and violate

the rights of minority non-residents, caused the deprivation of [his] constitutional rights .... " (2d Am.Compl.¶ 24.) [3] Hullett argues that the City of St. Joseph has a custom or practice of acquiescence to its officers' unconstitutional treatment of blacks by failing to investigate or discipline its officers after allegations of discriminatory treatment of blacks, and that St. Joseph's acquiescence in this conduct amounts to ratification of the conduct by the city.

A failure by a city to investigate complaints against its police officers or discipline its police officers for illegal acts can give rise to § 1983 liability. *See, e.g., Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1247 (6th Cir.1989); *Marchese v. Lucas,* 758 F.2d 181, 188 (6th Cir.1985). "The theory underlying these cases is that the municipality's failure to investigate or discipline amounts to a 'ratification' of the officer's conduct." *Dyer v. Casey,* 72 F.3d 129, 1995 WL 712765, at *2 (6th Cir.1995); *see also Walker v. Norris,* 917 F.2d 1449, 1457 (6th Cir.1990); *Leach,* 891 F.2d at 1248. Failure by a municipality to investigate or discipline its police officers "may permit an inference that the misconduct which injured the plaintiff was pursuant to an official policy or custom." *Tompkins v. Frost,* 655 F.Supp. 468, 472 (E.D.Mich. 1987)(mem. op.)(noting that "[t]he strength of the inference which could be drawn from a failure to investigate would vary from case to case depending on the nature of the notice given to the [municipality] ... and whether [the municipality] intentionally or recklessly failed to take appropriate action"). "In the failure to discipline context" a plaintiff must show "a history of widespread abuse that has been ignored by the city." *Berry v. City of Detroit,* 25 F.3d 1342, 1354 (6th Cir.1994). Hullett attempts to establish a policy or custom through several means, each of which is addressed below.

**1. Roddy testimony**

Hullett relies heavily on the deposition testimony of Reverend Mattie Roddy, president of the Twin City Branch of the National Association for the Advancement of Colored People ("NAACP"), which covers both Benton Harbor and St. Joseph. (*See* Roddy Dep. at 8, attached to Pl.'s Br. Opposing Mot. Summ. J.) Roddy testified that her branch has "a long history" of receiving complaints of discrimination, averaging approximately 35 to 40 complaints each month, over half of which involve law enforcement. (*Id.* at 25, 44.) Of these complaints against law enforcement, Roddy estimated that approximately twenty percent, about four a month, involve the City of St. Joseph police department. (*See id.* at 44.) Roddy explained that the NAACP investigates these complaints, attempts to discuss the particular incident with the police department, obtain the police report, and do anything else necessary to "hear both sides of the story to determine what has happened." (*Id.* at 32–33.) Roddy estimated that, after investigation, the NAACP concludes that "[a] little under half" of the complaints are legitimate. (*Id.* at 45.) The NAACP typically refers the complaints it believes are legitimate to the Michigan Civil Rights Commission, at which time the NAACP's involvement in the complaint ends. (*See id.* at 42.)

While this evidence of complaints to the NAACP, taken in the light most favorable to Plaintiff, demonstrates a pattern of harassment of blacks by St. Joseph police officers, Roddy's testimony does not address the custom or practice alleged by Hullett, namely that St. Joseph failed to investigate these complaints when it became aware of them or failed to discipline

---

**3.** However, Hullett has apparently abandoned his failure to train theory, as he has not presented any concrete evidence concerning the lack of training by St. Joseph or explaining how a different training program would have prevented the alleged violation of his rights sufficient to defeat a motion for summary judgment. *See Celotex Corp.,* 477 U.S. at 324–25, 106 S.Ct. at 2553–54 (1986); *Frank,* 4 F.3d at 1384. Therefore, summary judgment will be granted in favor of St. Joseph on Hullett's failure to train theory.

officers involved in these incidents. Hullett, apparently recognizing this weakness in his proofs, notes in his brief that Roddy testified that St. Joseph has been made aware of the complaints lodged with the NAACP. (*See id.* at 24–25.) However, there is no testimony as to what happened *after* the NAACP told St. Joseph about these complaints, other than the general statement that St. Joseph has not made any "outreach" efforts to the Twin City NAACP branch.[4] (*Id.* at 15.)

Therefore, Roddy's testimony does not address the central issue of whether St. Joseph failed to investigate or discipline its officers once it became aware of complaints, such that the city's failure to investigate or discipline its officers is evidence of "practices of municipal officials [that] are so permanent and well settled as to virtually constitute law," and such that St. Joseph's inaction demonstrates "deliberate indifference" toward Hullett's rights and was the "moving force" behind the alleged constitutional violations.

### 2. Independent studies cited by Roddy

Roddy also testified about studies done on the relationship between St. Joseph and Benton Harbor, including the well-publicized book by Alex Kotlowitz, *The Other Sider of the River*, and a study commissioned by Whirlpool, *A Tale of Two Cultures*, both of which document a racially charged atmosphere in St. Joseph and Benton Harbor. (*See* Roddy Dep. at 31; *see also* Gottfried Oosterwal, *A Tale of Two Cultures*, Pl.'s Br. Opposing Summ. J. Ex. G.). However, while this evidence may demonstrate that there are racial problems in St. Joseph and Benton Harbor, this evidence does not establish that the City of St. Joseph had a policy or custom of failing to investigate or discipline its police officers. Just as with Roddy's testimony, Plaintiff again fails to link this evidence of racial tension in St. Joseph and Benton Harbor to a policy or custom of St. Joseph in failing to investigate complaints or failing to discipline its police officers.

### 3. Branscumb affidavit

Hullett has also submitted an affidavit from Will Branscumb, the Legal Redress Chairperson of the Twin City Branch of NAACP. (*See* Branscumb Aff., attached to Pl.'s Br. Regarding Admissibility of Witness Testimony on City Custom.) Branscumb states that he has "received several complaints about harassment by the St. Joseph Police Department." (*Id.*) Branscumb also states that the people making these complaints indicated "they were stop[ped] and harassed for no reason at all." (*Id.*) However, Branscumb does not state that these complaints were ever brought to the attention of the St. Joseph Police Department, nor does he state that St. Joseph failed to investigate these complaints or discipline its officers involved in these complaints once the city became aware of the complaints. Therefore, this evidence suffers from the same problem plaguing Hullett's other evidence, in that there is no link between evidence of alleged incidents of racial harassment by St. Joseph police and a failure by St. Joseph to investigate the complaints or discipline

---

4. In fact, evidence obtained by Defendants from the Michigan Department of Civil Rights, to whom the Twin City branch of the NAACP normally referred all legitimate complaints, (*see* Roddy Dep. at 42), shows that only three complaints have been filed against the City of St. Joseph police department in the past ten years. (*See* McLin Aff. ¶ 2, Defs.' Supp. Exs. to Mot. Summ. Disposition.) Of these three complaints, two were voluntarily withdrawn by the claimant within two months of being filed. (*See* Notice of Disposition for MDCR No. 123258–LE66, Defs.' Supp. Exs. to Mot. Summ. Disposition; Notice of Disposition for MDCR No. 119126–LE62, Defs.' Supp. Exs. to Mot. Summ. Disposition.) The third, a claim by a black male resident of Benton Harbor that he was discriminated against by a white St. Joseph police officer when he was wrongly accused and charged with stealing someone's wallet, was voluntarily withdrawn by the claimant because the City of St. Joseph "ha[d] taken adjustive action." (Notice of Disposition for MDCR No. 144939–LE66, Defs.' Supp. Exs. to Mot. Summ. Disposition.)

the officers involved in the alleged incidents.

### 4. Atterberry testimony

Hullett also offers the testimony of Reverend James Atterberry, director of the Benton Harbor Street Ministry. (*See* Atterberry Dep. at 5, attached to Pl.'s Br. Opposing Mot. Summ. J.) Atterberry testified that he has heard concerns from Benton Harbor residents that they would not feel safe in a meeting with St. Joseph police if other people were not present. (*See id.* at 30.) This evidence once again is not linked to the City of St. Joseph's alleged policy or custom of failing to investigate or discipline its police officers.

### 5. Austin incident

Hullett also points to two prior incidents in particular to demonstrate St. Joseph's failure to investigate or discipline its officers for discriminatory practices. The first incident involved Lloyd Austin, a black man from Benton Harbor who sued the City of St. Joseph, alleging that on February 27, 1991, he was wrongfully arrested and detained by the St. Joseph police and that excessive force was used in making the arrest. *See Austin v. City of St. Joseph Police Dept.*, Case No. 5:93–CV–70, slip op. at 1, 5 (W.D. Mich. June 29, 1994)(Pl.'s Br. Opposing Mot. Summ. J. Ex. A.). The court concluded that St. Joseph police initially had probable cause to arrest Austin but that a genuine issue of material fact remained as to whether Austin was wrongfully detained and whether excessive force was used against him by the individual officer. *See id.* at 17. More significant for purposes of this case, however, is the court's conclusion that Austin failed to demonstrate that a policy or custom of St. Joseph caused the deprivation of his constitutional rights, and therefore the claim against St. Joseph was dismissed as a matter of law. *See id.* at 21. Austin never even alleged that St. Joseph failed to investigate or discipline the officers involved in the incident. Therefore, the Austin incident does not support Plaintiff's theory of a policy or custom by the City of St. Joseph of failing to investigate or discipline its police officers.

### 6. McGinnis incident

. The second prior incident offered as evidence by Plaintiff involved Eric McGinnis, a young black male who drowned in the river dividing Benton Harbor from St. Joseph in 1991. The circumstances of McGinnis' death was the subject of Alex Kotlowitz's book *The Other Side of the River.* Atterberry testified that the Eric McGinnis incident is one of the reasons Benton Harbor residents have told him that they wouldn't feel safe in an encounter with the St. Joseph police. (*See* Atterberry Dep. at 30.) Hullett also has testified that he was afraid of St. Joseph police because of the Eric McGinnis incident. (*See* Hullett Dep. at 92–94.) However, Plaintiff once again presents no evidence that the City of St. Joseph failed to investigate the McGinnis incident or discipline the officers allegedly involved. In fact, the Kotlowitz book shows that the St. Joseph police department did investigate the McGinnis incident. Although there is speculation about why McGinnis drowned, there is no proof of why he drowned. There certainly is no evidence that the St. Joseph Police Department caused the drowning. Plaintiff once again fails to link this evidence to a policy or custom of the St. Joseph police department of failing to investigate or discipline its officers.

### 7. Revocation of suspension

Finally, Hullett argues that St. Joseph's decision to revoke its suspension of Smiedendorf is itself evidence of St. Joseph's policy or custom of failing to investigate or discipline its officers and amounts to a ratification of Smiedendorf's conduct by St. Joseph. While St. Joseph's decision to revoke its suspension of Smiedendorf could give rise to an inference that Smiedendorf's conduct was pursuant to an official policy or custom, "[w]hether such an inference, standing alone, could support a finding of [municipal] liability is doubtful

in light of *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)." *Tompkins,* 655 F.Supp. at 472 n. 3.

■ The Supreme Court held in *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City,* 471 U.S. at 823–24, 105 S.Ct. at 2436. The Court explained that when the policy or custom relied upon by the plaintiff "is not itself unconstitutional," such as a policy or custom of failing to investigate or discipline its officers, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation." *Id.* at 824, 105 S.Ct. at 2436. In other words, municipal liability for failing to investigate or discipline its officers cannot be derived from a single act by a non-policy-making municipal employee. Proof of the existence of the policy *prior* to the incident that is the subject of the complaint is necessary because "[w]rongful conduct after an injury cannot be the proximate cause of the same injury ... [and] *Monell* forbids a finding of [municipal] liability except where the misconduct is pursuant to an official policy or custom and is also the 'moving force' behind the plaintiff's injury." *Tompkins,* 655 F.Supp. at 472. Therefore, because Plaintiff has failed to prove the existence of a policy or custom of failing to investigate or discipline its officers prior to this incident, Plaintiff cannot rely solely upon the revocation of the discipline against Smiedendorf to demonstrate a policy or custom by the City of St. Joseph.

In summary, the evidence presented by Hullett, even when taken in the light most favorable to him, at most establishes that:
(1) there have been several prior incidents of black persons being stopped without probable cause by St. Joseph police officers; (2) there is a racially charged environment in St. Joseph and Benton Harbor generally; and (3) many black citizens in the area are suspicious, perhaps even fearful, of St. Joseph police officers. However, Sixth Circuit precedent requires Hullett to prove that St. Joseph failed to investigate complaints against its police officers or discipline its police officers for these unconstitutional acts in order to maintain a claim against the city. *See, e.g., Leach,* 891 F.2d at 1247; *Marchese,* 758 F.2d at 188. Only by proving that St. Joseph was made aware of these complaints and failed to investigate or discipline its officers can Hullett meet the requirement of proving that the city's practices were "so permanent and well settled as to virtually constitute law," *Hilliard,* 903 F.Supp. at 1179, or that the city's "deliberate indifference" to the situation was "the moving force of the constitutional violation." *City of Canton,* 489 U.S. at 390, 109 S.Ct. at 1205; *Monell,* 436 U.S. at 694, 98 S.Ct. at 2038. Because Hullett has failed to provide any evidence that St. Joseph failed to investigate or discipline its officers, summary judgment must be entered in favor of St. Joseph.

## II. Pendent state law claims against Smiedendorf

■ At the hearing, the Court held that there was a genuine issue of material fact precluding summary judgment on both Plaintiff's assault and battery and gross negligence claims against Smiedendorf. The Court notes that Smiedendorf is not immune from tort liability under M.C.L. § 691.1407(2) under either a gross negligence or intentional tort theory. The immunity statute expressly revokes immunity for acts of gross negligence. *See* M.C.L. § 691.1407(2). As for the claim that the assault and battery was intentional and therefore outside the scope of the immunity statute, the Michigan Court of Appeals confirmed the common sense proposition that "an individual employee's

intentional torts are not shielded by our governmental immunity statute." .*Sudul v. City of Hamtramck*, 221 Mich.App. 455, 458, 562 N.W.2d 478, 479 (1997). This is because a defendant who commits an intentional tort is even more culpable than a defendant who is grossly negligent, and therefore the gross negligence exception in M.C.L. § 691.1407(2) must be read to include intentional conduct. *See id.*

Defendants finally argue that the assault and battery claim should be dismissed because Michigan applies the "objective reasonableness" test used under Fourth Amendment for assault and battery claims. However, the case cited by Defendants for this proposition explicitly states that the trial court improperly stated in its jury instructions that the standard for an assault and battery was the same as the standard for unconstitutional use of excessive force. *See id.* at 461, 562 N.W.2d at 480. In any event, this Court has found a genuine issue of material fact as to whether Smiedendorf's actions were objectively reasonable under the Fourth Amendment. Accordingly, summary judgment on Hullett's pendent state law claims against Smiedendorf will be denied.

### Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted in part and denied in part. Summary judgment will be entered in favor of Defendants Neubecker and City of St. Joseph. Summary judgment will be denied as to Defendant Smiedendorf.

An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion entered on this date,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment and Motion in Limine (docket no. 30) is **GRANTED IN PART AND DENIED IN PART.** Summary judgment will be entered in favor of Defendants Steve Neubecker and City of St. Joseph. Summary judg-

ment is denied as to Defendant Rick Smiedendorf. The Court defers ruling on Defendant's Motion in Limine until a later date.